DECISION
Plaintiffs appealed the value of certain residential real property located in Lane County for the 2009-10 tax year. The property is comprised of 73 Accounts, or 71 lots (subject lots), located in the Mountain Gate subdivision (Mountain Gate) in Springfield, Oregon. A trial was held in the Tax Courtroom in Salem, Oregon on June 29, 2011. David E. Carmichael, Attorney at Law, appeared on behalf of Plaintiffs. Todd Alberts (Alberts), real estate developer and principal of Alberts Development LLC, and Kent Voronaeff (Voronaeff), appraiser, testified on behalf of Plaintiffs. Bryce Krehbiel (Krehbiel), Residential Appraiser, appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1 and 2 and Rebuttal Exhibits 1 through 5 were received by the court. Defendant objected to Plaintiffs' Exhibit 1, arguing that restricted use appraisal reports are not appropriate for use in this court under OAR 161-025.0060(6).[1] The court admitted Exhibit 1, noting that Defendant's objection would be considered in weighing the evidence. Defendant's Exhibits A through P were received without objection by the court.
 I. STATEMENT OF FACTS
Alberts testified that he has been a real estate developer since the mid-1980s and has been involved in numerous projects in the Eugene area in that capacity. Alberts testified that he was *Page 2 
involved with the McDougal Brothers in the development of Mountain Gate. He testified that the McDougal Brothers selected the sections of Mountain Gate near the entrance and on the western side (Mountain Gate West); those lots were completed in earlier phases. Alberts testified that the subject lots are comprised of nine lots in the First Addition (3A lots) and 62 lots in the Second Addition (3B lots). (See Ptfs' Ex 1 at 20 (Mountain Gate map).) He testified that the 3A lots are finished and buildable, but the 3B lots are not yet finished and buildable. The subject lots "range in size from 0.23 to 1.18 acres. The lots are rectangular to irregular in shape, and level to steeply sloping." (Ptfs' Ex 1 at 7.) "Some lots have a view amenity." (Id.)
Alberts testified that the 3B lots are all on slopes and none have level driveways. He testified that that creates an access issue and will require high excavation costs. Alberts testified that the "uphill" and "downhill" lots of 3B are not going to sell for as much as level lots. He estimated excavation costs of $30,000 to $50,000 for "uphill lots" and $25,000 to $30,000 for "backfill" and "high wall" construction on "downhill lots." Alberts testified that lots 107 and 108 are especially steep, with a curb to hill top difference of 25 vertical feet. (See Ptfs' Rebuttal Ex 2 at 4 (photo of lots).) He testified that lots 107 and 108 are still for sale because it will be very difficult to construct a home site on those lots. Alberts testified that lots 83, 84, and 85 are downhill lots that face north. He testified that most of the lots in 3B face north and south and lack views. Alberts testified that it might be possible to provide views for the 3B lots if some trees were removed, but the City of Springfield (City) will not allow it.
Alberts testified that the listings for the subject lots expired some time ago, but some lots might be back on the market now. He testified that prospective buyers interested in the subject lots could contact Andrea Gramzow (Gramzow). Alberts testified that the subject lots were first listed in 2006 or 2007. He estimated that, in 2007, the subject lots were listed in the $80,000 to *Page 3 
$100,000 range. Alberts testified that it is better to list lots at full price and give discounts rather than lowering list prices because list prices are never the prices ultimately received.
Krehbiel testified that he followed the link to Andrea Gramzow's website from the Mountain Gate website and found the "current" list prices for the subject lots posted on her site. (Def's Exs RA, RB, RC.) He testified that most of lots in the Second Addition are listed on Gramzow's website in the range of $99,900 to $139,900 with a high of $199,900. (Def's Ex RC.) Krehbiel testified that lot 163 had increased in value from an earlier listing to $139,900. (Id.) He noted that two lots reported by Plaintiffs to be unbuildable, lots 129 and 130, are both listed at $119,900. (Id.) Krehbiel testified that, if those lots are unbuildable, it is not apparent based on the information on Gramzow's website. Krehbiel testified that several of the subject lots are listed as sold, including lots 126, 131, 132, 133, 134, 144, 146, and others. (Id.)
A. Plaintiffs'"finished lot value"
Voronaeff testified concerning his appraisal experience and education. (See Ptfs' Ex 1 at 21.) Additionally, he testified that he has purchased eight lots in the past year, including one in Mountain Gate. Voronaeff testified that his goal in valuing the subject lots was to mirror the market; his method of valuation involved determining the value of the subject lots as finished and then subtracting the costs required to finish the subject lots. Voronaeff testified that market participants would take into account all of the costs that he subtracted from the "finished" value of $60,000. Voronaeff testified that he considered comparable sales, but found sales data as of the January 1, 2009, assessment date to be lacking. He testified that the market was weak and not many sales occurred around that time.
Voronaeff testified that he considered several listings, but noted that listings must "be taken with a grain of salt." He testified that he identified several listings for Mountain Gate lots at *Page 4 
$65,000 or less that did not sell, including the following: a listing at $75,000 from January 30, 2009 to January 3, 2011, that was reduced to $55,000 on March 27, 2011, (See Ptfs' Rebuttal Ex 1 at 10-11); a listing on Forest Ridge Drive at $65,000 in September 2009 that finally sold for $33,000 on December 30, 2010 (See id. at 14-15); a listing from March 2009 through March 2010 at $65,000 that did not sell (Seeid. at 16-17); a listing at $75,000 on March 16, 2009, that was reduced to $65,000 on March 19, 2009, and canceled on March 2, 2010 (See id. at 18, 20); the lot that was ultimately purchased by Voronaeff, originally listed at $119,500 in April 2007, reduced to $103,000 on December 10, 2007, reduced to $69,900 in March 2009, reduced to $51,900 in June 2009, and purchased by Voronaeff for $30,000 in September 2009 (Seeid. at 27, 28).[2] In response to a question from Krehbiel, Voronaeff testified that he found some listings at higher prices than those provided, but did not think that those were helpful because even the lower listings were not selling. Voronaeff testified that he considered listings of the subject lots.
Voronaeff testified that he identified a few sales in Mountain Gate West. (See Ptfs' Rebuttal Ex 1 at 1-5.) He testified that a 0.23 acre lot sold in The Heights on January 20, 2009, for $105,000. (See id. at 3, 5.) Voronaeff testified that it is a flat level lot and, based on Alberts testimony, it would be necessary to subtract about $40,000 to compare it to a sloped lot. The other sale provided is a 0.26 acre lot that sold on November 30, 2009, for $82,500. (Id. at 1, 2.)
Voronaeff testified that he concluded a value of $60,000 per finished lot for the subject lots. He testified that he concluded a value of $60,000 for nine lots that he determined to be "finished" and unaffected by the cost of the debris pile, the punch list, and the pump station. (See Ptfs' Ex 1 at 7.) Those lots are 79, 80, 83, 84, 85, 90, 91, 99, and 101; they are all located in 3A. (Id. at 7, 20.) Voronaeff testified that he concluded a value of $10,000 for lots 107 and 108. *Page 5 
(See Ptfs' Ex 1 at 7.) He testified that he saw a letter from Olson and Morris, an engineering firm, stating that it would be "cost-prohibitive to develop" lots 107 and 108.[3]
B. Landslides and debris removal
Alberts testified that several 3B lots were affected by landslides, one in December 2006 and a second in January 2007. (See Ptfs' Rebuttal Ex 5 (newspaper article identifying the two slides and dates).) He testified that four families were evacuated from their homes following the slides. Alberts testified that, in February 2007, the City hired an engineering firm to inspect the slide area and the engineering firm determined that "the road fill should be rebuilt because it endangered nearby residents." (Id.) Alberts testified that, after the landslide, debris from the slide was removed from the slide area to above the road. He testified that the approximate size of the debris pile is 30,000 cubic yards; at 10 cubic yards per dump truck, that is approximately 3,000 dump trucks. Alberts testified that the debris pile is partially on Plaintiffs' land and partially on the land to the south, which belongs to Hayden Homes.
Alberts testified that he filed suit to recover costs associated with the slide and, through a court settlement, Coburg Road Quarry was found to be "partly responsible for the slide, and was ordered * * * to pay $332,000 toward paying the cost of fortifying the hill and rebuilding the road." (Id.) In 2009, Coburg Road Quarry filed suit against its insurer seeking coverage for the $332,000 settlement and other fees. (Id.) Alberts testified that, per the Settlement Agreement, effective "January 31, 2009," Plaintiffs are required to remove the debris pile. (See Ptfs' Ex 2 at 2-14.) Alberts testified that it was necessary to make a deal even if not agreeable to him, because *Page 6 
the litigation was costly and was causing delay in marketing the subject lots. He estimated that about 10 percent of the debris pile had been removed as of the date of trial.
Alberts testified that the slides occurred while he was in the process of marketing the 3B lots. He testified that the 3B lots are undesirable as a result of the slide and associated litigation. Alberts testified that one section of Mountain Gate completed during an earlier phrase has been named "The Heights" in order to distinguish it from the section of Mountain Gate affected by the landslides. He testified that he has not sold a lot in over two years.
Plaintiffs provided a cost estimate for removing the debris pile, ranging from $31.25 to $39.06 per yard for an overall cost ranging from $937,500 to $1,171,875. (Ptfs' Ex 2 at 24.) Alberts testified that that cost estimate was provided by a contractor and was relied upon by the City. (See id.) Voronaeff testified that he accepted the cost estimate provided by Alberts. "There were 60 lots which reportedly required a debris pile to be removed, as part of a legal settlement relating to a landslide in the subdivision, in order to obtain building permits at an estimated cost of $375,000 or $6,250 per lot * * *." (Ptfs' Ex 1 at 6.) Voronaeff testified that he used a figure lower than the actual settlement because Alberts indicated that he was under duress to accept a settlement. "It should be noted that this estimated amount of $375,000 to remove the debris pile is significantly less than the actual amount estimated by the [City] of $750,000 to $937,500. * * * It is concluded that a reasonable market participant (i.e. owner or buyer) would have only accepted an amount similar to the more conservative lower amount of $375,000 utilized in this analysis[.]" (Id.) Voronaeff subtracted his estimated cost of $6,250 per lot for debris removal from the "finished lot values" of the 60 affected lots. (Id. at 7-9.)
Voronaeff testified that he concluded an "as-is" lot value of $0 for the four lots directly affected by the landslides, lots 124, 126, 129, and 130. He testified that he concluded a "finished *Page 7 
lot value" for those four lots of $5,000 because the lots do not have "much utility for anything" except for, perhaps, open space. Voronaeff testified that he considered the $5,000 "finished lot" value to be a "nominal value"; it could also be $1. Krehbiel asked Voronaeff what substantiation he had for his conclusion that lots 124, 126, 129, and 130 are not buildable. Voronaeff testified that it is apparent from looking at those lots that they are not buildable.
Krehbiel testified that he found no evidence that the landslides resulted in a market stigma preventing sale of the subject lots. Defendant provided Regional Multiple Listing Service (RMLS) listing histories for 53 of the subject lots. (Def's Ex N.) On January 1, 2009, the list prices for the subject lots ranged from $99,900 to $199,900. (Id.) Krehbiel testified that the listing prices for the subject lots did not change after the landslides. (See generally Def's Ex N.) He testified that, for instance, a lot listed at $99,000 before the landslides was still listed at $99,000 after the landslides. (Def's Ex N at 1a.) Three of the lots that were directly affected by the landslide, lots 124, 129, and 130, were listed for $129,900, $119,900, and $119,900, respectively. (Def's Ex N 35A, 32A, 21A.) Krehbiel testified that the majority of the subject lots were continuously listed at $99,900 on January 1, 2009, and were still listed at $99,900 in late September 2009 when the listings were canceled. Krehbiel testified that he noticed several of the subject lots had "pending sales" at some point. (See, e.g., Def's Ex N at 51, 51a (lot listed as "pending" sale on January 1, 2007, then back on market after January 2, 2008).)
C. Pump station
Alberts testified that Plaintiffs are required to build a pump station at an estimated cost of $600,000.[4] He testified that, as of January 1, 2009, it was unknown when that cost would be incurred, but it was known that the cost of the pump station must be incurred. (See Ptfs' Ex 2 *Page 8 
at 1 (Ltr from Alberts, Aug 12, 2010).) Plaintiffs provided an agreement with the Springfield Utility Board (SUB) that requires Plaintiffs to install the pump station. (Ptfs' Ex 2 at 19-20.) Voronaeff testified that he spoke with someone at SUB who estimated the cost of the pump station to be about $600,000 and noted that the pump station could not be provided for less because the SUB wants its "approved people doing everything." (See Ptfs' Ex 2 at 23 (notes from conversation with "BART McKEE @ SUB").) Voronaeff determined that 39 of the subject lots require a pump station at a cost of $15,385 per lot. (Ptfs' Ex 1 at 6).
D. Punch list items
Alberts testified concerning the "punch list items" that must be completed by Plaintiffs. He provided a list of "punch list items" to be completed, as of January 1, 2009:
 "street trees 70 LOTS x 2,000 per lot installed = 140,000
 "sidewalks 3100' x 8[00]
= 24,800[00]
 "storm sewer stub too high on jessica 12,000[00]
 "x number of asphalt streets on panhandle lots 300[00] x 500' = $15,000.00
 "curb cut/driveway on jessica 5,000
 "pile 1,200,000
 "sub 500,000
 "sign at end of subdivision 1,000
 "one lot can't be used until phase 4 is built 0
 "107 107 too steep to build 0 (50,000 in excavation)
 "126 unbuildable because of the slide 0
 "fence along slide area 10,000
 "water line pressure test on upper lots 15,000"
(Ptfs' Ex 2 at 22.) Defendant provided a document entitled "City's Understanding of the Status of Punchlist and Other Outstanding Items for MountainGate 3B (P30454) as of 9/17/09" that is based on the "Original Punchlist from Olson Morris, dated October 27, 2008[.]" (Def's Ex K.)
Alberts testified that the punchlist costs are estimates. He testified that there is currently no contract in place for street trees, but he has received bids. Alberts testified that Plaintiffs have a development agreement with the City requiring Plaintiffs to install sidewalks if they are not *Page 9 
installed by a certain time by lot purchasers; he estimated that there is about one year left before Plaintiffs must install sidewalks. Alberts testified that $8 per linear feet of sidewalk is the standard price, but there is currently no contract in place for the installation of sidewalks.
Voronaeff testified that the costs for the "punch list" items provided to him by Alberts appeared to be reasonable. He stated that "there were 60 lots which reportedly required punch list items to be completed in order to obtain building permits at a cost of $222,800 or $3,713 per lot[.]" (Ptfs' Ex 1 at 6.) Voronaeff testified that Plaintiffs' punch list includes the cost of removing the debris pile and of installing the pump station, but Voronaeff excluded those items from his punch list cost because including those items would constitute double-counting. Voronaeff concluded a "punch list" cost of $3,713 per lot and subtracted that cost from the finished lot value of the 60 lots that "required punch list items to be completed in order to obtain building permits[.]" (Id.)
E. Contingency factor and developer's profit
Voronaeff testified that he considered a 20 percent contingency factor and 25 percent developer's profit to be reasonable in this case. He testified that he spoke with several "market participants" to determine a reasonable contingency factor and developer's profit. Voronaeff testified concerning the specific individuals who he contacted, including Hayden Homes (the owner of the subdivision south of the subject lots); "one of largest regional builders in the Northwest"; a developer of high-end subdivisions in Bend, Oregon and Hawaii; a developer of subdivisions in Florence, Oregon; a developer of subdivisions in Eugene, Oregon; and two real estate brokers. Voronaeff testified that all would expect a 20 percent contingency factor and 25 percent (or more) developer's profit. Voronaeff testified that, to determine "as-is" lot values, he first subtracted the costs associated with punch list items, debris pile removal, and the pump *Page 10 
station, as applicable, and then multiplied the resulting value by the 20 percent contingency factor and the 25 percent developer's profit.
F. Restricted use appraisal
Voronaeff testified that the appraisal he prepared is a restricted use appraisal; it is for one intended user and one specific use. He testified that his appraisal was prepared for Mr. Carmichael for use in this tax appeal. Krehbiel objected, stating that restricted use appraisals are not appropriate for use in this court. Krehbiel referred to OAR 161-025.0060(6), requiring that testimony before this court must be based on a summary appraisal. He further stated that Voronaeff did not provide his complete work file. Krehbiel noted that he could not assess the accuracy of Voronaeff's appraisal because it is a restricted use report. Voronaeff responded that he brought part, but not all, of his work file with him to trial.
G. Defendant's comparable sales
Krehbiel testified that he provided several maps of lots sold in Mountain Gate along with Regional Land Information Database (RLID) Summary Property Reports for each lot. (See Def's Exs B, C, D, E, F, and G.) Krehbiel noted that four of the sales he identified were in the same section of Mountain Gate as the subject lots and each of those sales occurred in 2007 and 2008, after the landslides. (Def's Ex B.) He testified that those sales provide further support for his determination that the landslides did not create a stigma affecting the sale of Mountain Gate lots. Sales identified by Defendant include the following:
Lot size Sale date Sale price Location Exhibit
0.48 acre Apr 27, 2007 $184,290 "2nd Addition" Def's Ex B
0.25 acre Jul 5, 2007 $107,240 "2nd Addition" Def's Ex B
0.25 acre Jan 10, 2008 $115,000 "Mountain Gate" Def's Ex C
0.24 acre Mar 17, 2008 $150,000 "Mountain Gate West" Def's Ex G
0.50 acre Apr 29, 2008 $105,000 "Mountain Gate First Addition" Def's Ex E
0.34 acre May 19, 2008 $143,000 "Mountain Gate West" Def's Ex F
0.27 acre May 29, 2008 $90,000 "2nd Addition" Def's Ex B
 *Page 11 
0.27 acre Jun 10, 2008 $105,000 "2nd Addition" Def's Ex B
0.46 acre Jun 10, 2008 $170,000 "Mountain Gate West" Def's Ex D
0.37 acre Jul 10, 2008 $150,000 "Mountain Gate West" Def's Ex F
0.54 acre Jul 29, 2008 $164,000 "Mountain Gate West" Def's Ex F
0.28 acre Dec 11, 2008 $89,000 "Mountain Gate West" Def's Ex F
0.24 acre Jan 23, 2009 $105,000 "Mountain Gate West" Def's Ex G
0.39 acre Nov 4, 2009 $85,000 "Mountain Gate West" Def's Ex G
0.26 acre Nov 20, 2009 $82,500 "Mountain Gate First Addition" Def's Ex C

Alberts testified concerning Krehbiel's use of sales in earlier phases of Mountain Gate. (See Ptfs' Rebuttal Ex 2 (photos of Mountain Gate lots and homes).) Alberts testified that one of Defendant's sales occurred in 2007 and involved a fairly level corner lot. (Id. at 3.) He testified that Defendant's sales from earlier phases of Mountain Gate are not comparable to the subject lots because they occurred during a time when the market was better (2007 and 2008), the lots are overall more level, and they do not suffer from the stigma associated with the landslides. (Seeid. at 7 (photo of lots in "The Heights" that Alberts characterized as large, flat lots backing up into open space with views of Springfield and Eugene); at 12 (portion of "The Heights"); at 13-16 (four lots in "The Heights").) Alberts testified that many of the lots in "The Heights" section of Mountain Gate have superior views to the 3B lots; some lots are also on the park. (See id. at 6 (photo of half-acre lot with view located on the park).)
Voronaeff testified that he does not think the Mountain Gate sales relied on by Defendant are relevant because they occurred in 2007 and 2008 when the market was better. Alberts testified that the Dow Jones peaked in August 2008 at 13930.01 and hit its lowest point in January 2009 at 7062.93. (Ptfs' Rebuttal Ex 3.) Krehbiel testified that Defendant's ratio report revealed a 4.5 percent appreciation in land values or ".38% per month increase" from January 1, 2007, to December 31, 2007, (Def's Ex H); a 1.5 percent depreciation in land values or ".13% per month" decrease from January 1, 2008, to December 31, 2008, (Def's Ex I); and a significant *Page 12 
decrease of about two percent per month or 24 percent for the year from January 1, 2009, to December 31, 2009. (Def's Ex J).
H. Defendant's value conclusion
Krehbiel testified that he determined the value for the 71 subject lots to be $9,492,212 and subtracted the estimated "cost to cure [of] $1,600,000" for a 2009-10 real market value of $7,892,212 for the subject lots. (Def's Ex A.) He testified that the 2009-10 total maximum assessed value for the 71 subject lots is $5,858,546, which is less than the 2009-10 total real market value that he concluded. (See id. at 2.) The 2009-10 real market values of the subject lots range from $93,686 for Account 1765112 (lot 83) to $160,370 for Account 1792298 (lot 115). (Id. at 1; Ptfs' Ex 1 at 7.) Krehbiel testified that this case presents "cost to cure" issues; however, the costs of $15,000 per lot for the pump station and $6,000 per lot for debris removal do not result in a real market value that is less than the maximum assessed value. Voronaeff testified that he does not think the values concluded by Defendant are close to the values that the subject lots would have sold for on January 1, 2009. (See Def's Ex A.)
 II. ANALYSIS
The issue before the court is the real market value of the subject lots for the 2009-10 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citingGangle v. Dept. of Rev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [5] which states,
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed *Page 13 
seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
The Oregon Supreme Court in First Interstate Bank v. Dept. ofRev. held that "each property [in a subdivision] must be individually assessed to ascertain the true cash value of the properties[.]" 306 Or 450, 452, 760 P2d 880 (1988).
Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept. of Revenue,4 OTR 302, 312 (1971). Plaintiffs "must establish by competent evidence what the appropriate value of the property was as of the assessment date in question." Woods v. Dept. of Rev.,16 OTR 56, 59 (2002) (citation omitted). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof[.]" Reed v. Dept. of Rev. (Reed),310 Or 260, 265, 798 P2d 235 (1990).
A. Approaches of valuation — real market value
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to be inapplicable. See ORS 308.205(2) and OAR 150-308.205-(A)(2). "[W]hether in any given assessment one approach should be used exclusive of the others or is preferable to another or to a combination of the approaches is a question of fact to be determined by the court upon the record." PacificPower Light Co. v. Dept. of Rev.,286 Or 529, 533, 596 P2d 912 (1979). Both parties relied, to some extent, on the sales comparison approach to value the subject lots. Neither party considered the cost or income approaches.
The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant."Chambers Management Corp v. Lane County Assessor, *Page 14 
TC-MD No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute,The Appraisal of Real Estate 335 (12th ed 2001).
 "Under the sales comparison approach, the value of a property is derived by comparing the subject property with similar properties, called comparable sales. * * *. That comparison is based on many factors, and adjustments are made for any differences between the comparable sales and the subject property so that the appraiser can derive a value for the subject property."
Magno v. Dept. of Rev. (Magno),19 OTR 51, 58 (2006) (citations omitted); see also
OAR 150-308.250-(A)(2)(c) ("In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used."). Thus, "[t]he court looks for arm's-length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of the subject property.Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003).
B. Plaintiffs' value evidence
Plaintiffs' valuation methodology requires the court to accept a "Finished Lot Value" as the starting point for determining the real market value for each of the subject lots. Voronaeff concluded a "Finished Lot Value" of $60,000 for all but six of the 71 lots at issue. The six lots for which the "Finished Lot Value" is less than $60,000 are lots 107 and 108, which Voronoaeff testified are unbuildable based on the steep grade, and lots 124, 126, 129, and 130, which Voronoaeff testified are unbuildable as a result of the landslides. Voronaeff's report states that his "value conclusions are based on the Sales Comparison Approach." (Ptfs' Ex 1 at 5.) Additionally, the report states that Voronaeff's "investigation included, but was not limited to, area neighborhood information, subject property data, a personal inspection of the subject properties, assembly of lot sales data, lot sales listings, construction cost data, and other pertinent factors which affect the value of the subject properties either directly or indirectly. The lot sale comparables were verified with the real estate *Page 15 
broker, buyer, and/or seller." (Id. at 4-5.) However, the information pertaining to sales and listing data was not included in the report. Plaintiffs did provide some listings as rebuttal exhibits.
The court is not persuaded by Voronaeff's conclusion of $60,000 as the "Finished Lot Value" for all but six of the subject lots for several reasons. First, the "Finished Lot Value" concluded by Voronaeff does not account for differences between the subject lots such as lot size, lot shape, view, slope, or other differences, if any. The subject lots vary in size from 10,019 square feet (0.23 acres) to 51,401 square feet (1.18 acres), but no difference is reflected in the value conclusion. (Ptfs' Ex 1 at 7-9.) For example, Voronaeff concluded a "Finished Lot Value" of $60,000 for both lot 148, which is 0.23 acres, and for lot 115, which is 1.18 acres.[6] Voronaeff's report indicates that some of the subject lots have a "view amenity"; however, that difference is not reflected in the lot values concluded. (Id. at 7.) Voronaeff's report also indicates that some lots vary in shape from "rectangular to irregular" and that lots vary in grade from "level to steeply sloping"; again, those differences are not reflected in the value conclusions. (Id.)
Second, and related to the court's first concern, it does not appear that Plaintiffs truly consider all but six of the subject lots to have the same "Finished Lot Value." Alberts' testimony and Defendant's evidence concerning the January 1, 2009, list prices for the subject lots both confirm that Plaintiffs do not consider the subject lots to be of equal value. Alberts testified that the subject lots were listed in the "range" of $80,000 to $100,000 in 2007. The January 1, 2009, RMLS list prices for 53 of the subject lots vary dramatically, ranging from $99,900 to $199,900. (Def's Ex N.)
Third, the market data presented by the parties is inconclusive, suggesting that a value of $60,000 or $65,000 may be appropriate for some lots and higher values for other lots. Plaintiffs provided listings of lots in Mountain Gate close to the January 1, 2009, assessment date including *Page 16 
several listings between January 2009 and March 2009 that ranged from $69,900 to $75,000.[7] Voronaeff also testified that he reached a settlement with Defendant for a 2009-10 real market value of $65,000 for a lot in Mountain Gate that he purchased for $30,000 in September 2009. Defendant provided data for sales of lots in Mountain Gate, two of which were within a month of the January 1, 2009, assessment date. Those sale prices were $89,000 and $105,000 and involved lots in Mountain Gate West. Alberts testified that lots in Mountain Gate West are more desirable than the subject lots, suggesting a downward adjustment may be required. Defendant also identified two lots in the Second Addition that sold for $90,000 and $105,000 in May and June 2008, respectively. Again, a downward adjustment for time may be necessary. Noting that none of the sale or listing prices were adjusted for time, size, shape, view, grade, or any other factors, it appears that the "Finished Lot Values" for the subject lots as of January 1, 2009, were probably in the range of $60,000 to $105,000. Unfortunately, the court cannot determine the real market value for each of the subject lots as finished based on the evidence presented.
Alberts and Voronaeff testified persuasively concerning the numerous costs attributed to the subject lots, including removal of the debris pile, the installation of a pump station, the punch list items, and the costs associated with excavation and backfill of steep lots. However, the court did not find Voronaeff's "Finished Lot Value" determinations to be persuasive. Plaintiffs' value evidence is "inconclusive [and] unpersuasive" in several respects described above, thus, Plaintiffs have failed to meet the burden of proof. Reed, 310 Or at 265.
 III. CONCLUSION
After carefully considering the testimony and evidence presented, the court finds that Plaintiffs have failed to prove their requested real market values for the subject lots by a *Page 17 
preponderance of the evidence. The court is unable to determine the 2009-10 real market values of the subject lots based on the evidence presented. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.
Dated this ___ day of December 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Pro Tempore Allison R.Boomer on December 12, 2011. The Court filed and entered thisdocument on December 12, 2011.
[1] Defendant raised the objection after Plaintiffs' Exhibit 1 had already been offered and admitted.
[2] Voronaeff testified he reached a settlement with Defendant in a Magistrate Division appeal concerning the lot that he purchased in Mountain Gate. He testified that the parties agreed to a real market value of $65,000.
[3] Defendant presented an RLID Summary Property Report indicating that "Map Taxlot# 17-02-34-43-04000" is improved with a 3,492 square foot dwelling. (Def's Ex RH at 7.) Krehbiel testified that that map and tax lot number corresponds to the map and tax lot number associated with lot 107 in Voronaeff's appraisal. (Ptf's Ex 1 at 7.) Voronaeff testified the account numbers are different for lot 107; his appraisal states the number to be Account 1765351 whereas Defendant's Exhibit RH states the number to be Account 1765344. (Ptf's Ex 1 at 7; Def's Ex RH at 7.) Voronaeff testified that the map and tax lot number in his report probably contains a typographical error.
[4] Plaintiffs' Exhibit 2 at 1 states that the Springfield Utility Board's (SUB's) cost estimate for the pump station is $500,000.
[5] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2007.
[6] Voronoaeff concluded an "As-Is Lot Value" of $45,056 for both of those lots.
[7] "Listings are generally recognized as the upper limit for most completed sale transactions." Lane County Assessor v. BabcockProperties, LLC, TC-MD No 100131D at 9 (Jun 7, 2011).